J-S13001-24
J-S13002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN THE INTEREST OF: T.C., A MINOR   :    IN THE SUPERIOR COURT OF
                                       :               PENNSYLVANIA
                                         :

APPEAL OF: T.C., FATHER             :
                                         :
                                         :
                                         :               No. 1449 WDA 2023

Appeal from the Order Entered November 13, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000126-2023

IN RE: T.C., A MINOR                :      IN THE SUPERIOR COURT OF
                                         :               PENNSYLVANIA
                                           :

APPEAL OF: T.M.S., MOTHER        :
                                         :
                                         :
                                         :               No. 1479 WDA 2023

Appeal from the Order Entered November 13, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000126-2023

BEFORE:    KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:               **FILED: JUNE 21, 2024**

     T.C. ("Father") and T.M.S. ("Mother") (collectively, "Parents") appeal

from the order involuntarily terminating their parental rights to their minor

---

[*] Former Justice specially assigned to the Superior Court.

daughter, T.C. ("Child"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1, 2] After careful review, we affirm.

We summarize the relevant facts and procedural history as follows: The Allegheny County Office of Children, Youth, and Family Services ("CYF") first became involved with this family on January 14, 2022, upon receiving a report that Mother, who resided with Child in the home of Child's maternal grandmother, went to the emergency room for substance abuse withdrawal symptoms and was seeking inpatient drug rehabilitation. Notes of Testimony, 10/20/23 at 68; CYF Exhibit 9 (Shelter Care Order). Father, as best we discern, did not reside with Mother and Child. CYF also became aware that he had a history of substance abuse and domestic violence. *Id.* at 69. As such, the juvenile court placed Child in the emergency protective custody of CYF on January 15, 2022, and following a hearing, adjudicated her dependent on February 16, 2022. *Id.*

In furtherance of Child's permanency goal of reunification, the court ordered Parents to, *inter alia*, participate in drug and alcohol treatment and submit to random urine screens. *Id.* at 70-72. To assist in these

_____

[1] Parents filed separate appeals. Because Parents raise similar issues concerning the same factual and procedural events in their respective briefs, we *sua sponte* consolidate the above-captioned cases for disposition pursuant to Pa.R.A.P. 513.

[2] The same order involuntarily terminated the parental rights of any unknown father of Child, and he did not file a notice of appeal.

requirements, CYF referred Parents to Jade Wellness, a drug and alcohol outpatient treatment center, and POWER.[3] *Id.* at 13-14, 28; CYF Exhibit 1 & 2. With respect to the random urine screens, CYF required that Parents perform them at the Allegheny County Health Department Drug and Alcohol Screening Laboratory ("ACHD"). Notes of testimony, 10/20/23 at 43.

In addition to her substance abuse related goals, the court ordered Mother to work with in-home services and to obtain appropriate housing. *Id.* at 70-71. CYF referred her to the ARIA Program, a twelve-month rental assistance program for people who "usually have some type of drug involvement." *Id.* at 55. According to the ARIA housing coordinator, Melissa Adams, the program finds housing for the recipients "so they are able to re-stabilize in the community." *Id.* In return, the program requires the recipients to, *inter alia*, participate in and maintain engagement with drug and alcohol treatment. *Id.* at 57.

---

[3] The orphans' court explained:

> POWER stands for PA Organization for Women in Recovery. This program is one of five Certified Assessment Centers in Allegheny County and provides screens and assessments for both men and women, regardless of the type of funding or lack thereof. POWER will make referrals based on the assessment and preference of the individual seeking treatment and ensures linkage to services, confirmation of admission, encouragement, and re-engagement services as necessary.

Orphans' Court Opinion ("O.C.O.") (Father), 1/17/24 at 5, n.5.

Finally, the juvenile court ordered Parents to participate in supervised visitation with Child. *Id.* at 70. Neither Father nor Mother progressed to unsupervised visitation during Child's dependency proceedings. *Id.* at 76, 82.

Permanency review hearings were held by the court at regular intervals. The court found that Father "made no progress in addressing his goals, other than involving himself in supervised visitation," which, as best we discern, occurred once per week. O.C.O. (Father) at 6 (citing notes of testimony, 10/20/23 at 77-78); *see also* Dr. Bliss Report, 10/9/23 at 7 (unpaginated). With respect to Mother, the court found that she "did not make any sustained progress" on her goals, other than consistently availing herself of supervised visitation. O.C.O. (Mother) at 5-6.

On May 30, 2023, CYF filed a petition for the involuntary termination of Parents' respective parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[4] Thereafter, CYF referred Parents, Child, and the pre-adoptive kinship foster parents, with whom Child has resided since

_____

[4] On July 6, 2023, the orphans' court appointed KidsVoice to represent Child's legal interests in the contested involuntary termination proceedings. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) ("Given the critical importance and permanency of termination proceedings, as well as children's inability to navigate the termination process themselves, we hold that appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with Subsection 2313(a).").

August of 2022,[5] for individual and interactional evaluations with Beth A. Bliss, Psy.D., a licensed psychologist.

The evidentiary hearing occurred on October 20, 2023, and November 6, 2023, during which Child, then three years old, was represented by legal counsel from KidsVoice. CYF presented the testimony of Daniel Garrighan, the Jade Wellness program director; Rachel Wagner, an employee at POWER; Rachel Poole, an employee at ACHD; Melissa Adams, the housing coordinator for the ARIA Program; and Kellie Pavilonis and Renee Taddy, both CYF caseworkers. In addition, CYF introduced into evidence juvenile court orders from Child's dependency record, Father's criminal dockets, and reports from Jade Wellness, ACHD, and the ARIA Program.

Father testified and presented the testimony of Dr. Bliss. Further, Father introduced into evidence Dr. Bliss's reports. Mother also testified on her own behalf.

By order dated November 6, 2023, and docketed on November 13, 2023, the orphans' court involuntarily terminated Parents' parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Parents separately filed timely notices of appeal and concise statements of errors

---

[5] Child was initially placed in kinship care with her maternal aunt. Notes of testimony, 10/20/23 at 69. On August 2, 2022, Child was transferred to her current pre-adoptive kinship placement. *Id.* at 84.

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The

orphans' court filed separate Rule 1925(a) opinions on January 17, 2024.

On appeal, Father questions whether the orphans' court committed an

abuse of discretion or error of law with respect to 23 Pa.C.S.A. § 2511(b).

**See** Father's Brief at 6. Mother questions whether the court committed an

abuse of discretion or error of law with respect to 23 Pa.C.S.A. § 2511(a)(2),

(5), (8), and (b). **See** Mother's Brief at 7.

The involuntary termination of parental rights is controlled by

Pennsylvania's Adoption Act ("Act"), 23 Pa.C.S.A. § 2511, which requires a

bifurcated analysis.

> Our case law has made clear that under Section 2511,
> the court must engage in a bifurcated process prior to
> terminating parental rights. Initially, the focus is on
> the conduct of the parent. The party seeking
> termination must prove by clear and convincing
> evidence that the parent's conduct satisfies the
> statutory grounds for termination delineated in
> Section 2511(a). Only if the court determines that the
> parent's conduct warrants termination of his or her
> parental rights does the court engage in the second
> part of the analysis pursuant to Section 2511(b):
> determination of the needs and welfare of the child
> under the standard of best interests of the child. One
> major aspect of the needs and welfare analysis
> concerns the nature and status of the emotional bond
> between parent and child, with close attention paid to
> the effect on the child of permanently severing any
> such bond.

**In re B.J.Z.**, 207 A.3d 914, 921 (Pa.Super. 2019) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing

evidence that the asserted statutory grounds for seeking the termination of

parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009).

We need only agree with the orphans' court as to any one subsection of

Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843

A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

We review the subject order for an abuse of discretion. Our Supreme

Court has explained:

> This standard of review [. . .] requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. *See In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. *See S.P.*, 47 A.3d at 826. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. *See id*. at 821. […] "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *S.P.*, 47 A.3d at 821 (internal citation and quotation omitted).

*In re Adoption of C.M.*, 255 A.3d 343, 358-359 (Pa. 2021) (some citations

omitted).

Instantly, Father has waived any claims concerning Section 2511(a) for

failure to raise them in his concise statement of errors complained of on appeal

and statement of questions involved in his brief. Father sets forth only one issue in his appeal, and it pertains to Section 2511(b). Thus, we do not review Section 2511(a) with respect to the termination of Father's parental rights. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa.Super. 2017) ("[I]t is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.") (citing *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa.Super. 2006)).

We analyze the involuntary termination order pursuant to Section 2511(a)(2) of the Act with respect to Mother and Section 2511(b) to Parents, which provide as follows.[6]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary

---

[6] We need not review Mother's issues regarding Section 2511(a)(5) and (8). *See In re B.L.W.*, 843 A.2d at 384.

- 8 -

> consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (citation omitted). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during the dependency proceedings. *In re S.C.*, *supra* at 1105 (citation omitted).

With respect to Section 2511(b), trial courts are required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Regarding the "emotional

needs and welfare" of the child, our precedent has interpreted it to include "intangibles such as love, comfort, security, and stability." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation and quotation marks omitted).

Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, trial courts must examine the effect on the child of severing such a bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085 (Pa. 2023). The High Court recently explained:

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

*K.T.*, 296 A.3d at 1109-1110 (some citations omitted).

As such, the *K.T.* Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. *Id.* at 1111. Specifically, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on

evidence of an 'adverse' or 'detrimental' impact to the child." ***Id.*** at 1114. The Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." ***Id.***

Moreover, in reiterating that the parental bond is only one part of the analysis, the ***K.T.*** Court held that the "Section 2511(b) inquiry must also include consideration . . . [of] certain evidence **if it is present in the record**." ***Id.*** at 1113, n.28 (emphasis in original). The specific evidence at issue in ***K.T.*** related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home and the child's bond with foster parents; and whether the foster home met the child's developmental, physical, and emotional needs. ***Id.*** at 1112. The Court emphasized, however, that these foregoing factors were not an exhaustive list for consideration under all Section 2511(b) analyses. ***Id.*** at 1113, n.28. Rather, the ***K.T.*** Court found, as noted above, that the particular facts of each case determine the factors to be considered.

Further, the Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the child" in its

analysis under Section 2511(b). ***See In re M.M.***, 106 A.3d 114, 118 (Pa.Super. 2014).

We begin with Mother's argument that the evidence was insufficient to terminate her parental rights pursuant to Section 2511(a)(2). Mother acknowledges that the evidence demonstrated she "had substance abuse issues, at first complied with treatment plans and then relapsed." Mother's Brief at 18. However, she argues that this evidence was insufficient to terminate her parental rights "particularly in light of [her] willingness to work on her substance abuse issues." ***Id.*** We disagree.

The record reveals that Mother suffers from "opioid use disorder." O.C.O. (Mother) at 17 (citing Exhibit 20 – Dr. Bliss report, 11/2/23). The court credited the testimony of CYF's witnesses, Mr. Garrighan, Ms. Wagner, and Ms. Poole, which it aptly set forth in its Rule 1925(a) opinion. ***See id.*** at 13-16 (citing notes of testimony, 10/20/23 at 16-21, 28-29, 30-38, 43, 45; Exhibit 3, Mother's ACHD Screen Results). The court summarized the foregoing witnesses' testimony, as follows.

> Mother failed to follow through with POWER assessments, which would have allowed her to receive recommendations for treatment, referrals to appropriate treatment programs and services, and mentorship. The POWER representative credibly testified about the efforts the agency made to try and engage Mother. Mother showed up for three out of a total fifty-five random urine screens at the ACHD and did not produce any urine to be screened when she did show up. Mother failed to present any credible testimony or evidence that she had addressed her substance abuse problem. Jade Wellness, the

> program that Mother selected and attended with the most consistency, provided clear and convincing evidence that Mother had not remedied her substance abuse issues, demonstrated relapse in her October 2022 urine screen, continued to need treatment, and had a guarded prognosis.

*Id.* at 16.

With respect to Mother's attendance at Jade Wellness, Mr. Garrighan testified that she was consistent in both her treatment and drug screening from January of 2022, until January of 2023. N.T., 10/20/23, at 16-20. On January 2, 2023, Mother's last date of attendance, Jade Wellness had recommended that she continue with ongoing services due to that agency's October 3, 2022, report revealing that she had tested positive on September 29, 2022, for cocaine and fentanyl. *Id.* Thereafter, Mother stopped submitting to drug screens at Jade Wellness, despite being requested to do so on a monthly basis. *Id.* Jade Wellness attempted unsuccessfully to reengage Mother in its program and, as a result, unsuccessfully discharged her in June of 2023. *Id.* at 20.

Mr. Garrighan confirmed on direct examination his opinion that Mother "appeared to remain in the pre-contemplation stage of change throughout her treatment episode, making little sustainable changes that would support long-term recovery." *Id.* at 20-21. In short, Mr. Garrighan opined that Mother's prognosis "is guarded, as she appears to continue to need treatment." *Id.* at 21.

The orphans' court acknowledged Mother's vow to obtain drug treatment. O.C.O. (Mother) at 17. However, the court found her testimony "to be incoherent and lacking in credibility." *Id.* at 16. The court explained:

> When asked by her counsel what Mother intended to do moving forward, Mother testified that "if I am given a second chance, I will go to, like, I will start with inpatient. Like I will go there first if that's what's recommended or what she wants." [N.T., 11/6/23,] at 83. Mother's counsel continued, asking Mother what steps she has taken since July 2023 to demonstrate her sobriety, to which Mother answered, "Well, since Jade didn't answer, they stopped answering me I — because I was like I said, I was wrong for that. After the last hearing, I did put myself in — I went to Greenbrier, Gateway, and I did go to the detox for three to four days. Because the court — November 9th, it was — year. It was supposed to be November 9th. It was soon. So I couldn't go two weeks. But I went into detox, and then I called SPHS,[7] and the earliest classes are November or December 6th. So I know they were after, like, the court hearing that was today. No, I don't have paperwork because I didn't get it fast enough. But after the last hearing, I did go to detox, and I want to prove that I'm serious." *Id.* at [8]3-[8]4.

*Id.* at 16-17.

To the extent the court found disingenuous Mother's vow to obtain treatment if given "a second chance," we discern no abuse of discretion. *In re S.C.*, *supra*. Even if the court credited Mother's testimony in this regard, Pennsylvania law is well-settled that the court may also properly reject it as untimely. *Id.* In *In re S.C.*, this Court explained:

---

[7] Mother did not further identify or describe "SPHS."

[Section 2511](a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in [Section 2511](a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re S.C.*, 247 A.3d at 1104–1105 (quoting *In re Z.P*, 994 A.2d 1108, 1117 (Pa.Super. 2010)). Thus, Mother's contention that the court abused its discretion in terminating her parental rights in light of her vow to obtain substance abuse treatment if given "a second chance," is meritless.

In this case, the record demonstrates that Mother's repeated and continued incapacity, neglect, or refusal to obtain substance abuse treatment and conquer her addiction has caused Child to be without essential parental care, control, or subsistence necessary for her physical or mental well-being for approximately twenty-two months by the conclusion of the hearing. Indeed, the orphans' court credited Dr. Bliss's opinion that "there is extreme concern with the possibility that [Mother] is still abusing substances at least sometimes, which would hinder or prevent her from meeting the needs and welfare of her daughter." O.C.O. (Mother) at 18 (citing Exhibit [19]). Further, the record reveals that Mother has a long-standing history with substance abuse, and that the conditions and causes of her incapacity, neglect, or refusal

to obtain treatment and conquer her addiction cannot or will not be remedied. As such, Mother's claim with respect to Section 2511(a)(2) fails.

We now consider Mother's final issue regarding Section 2511(b). Mother argues that the court disregarded Dr. Bliss's expert opinion "that terminating [her] parental rights would not meet Child's needs," and, thus, abused its discretion. Mother's Brief at 22. We disagree.

With respect to whether Child shared a bond with Mother, Dr. Bliss testified that Child has "a secure and positive attachment" to her. Notes of testimony, 11/6/23 at 15. However, Dr. Bliss opined that it was "slightly more limited than one would expect from a mother and child." *Id.* Nevertheless, Dr. Bliss confirmed that Child has a "strong bond" with Mother. *Id.* at 16. On cross-examination by Mother's counsel, Dr. Bliss testified that, based on the aforementioned bond, terminating Mother's parental rights would not serve Child's needs. *Id.* at 21.

However, the court explained that it weighed additional evidence by Dr. Bliss who "indicated both in her report and testimony that she found Mother to be deceitful. Exhibits [19, 20]. . . . Dr. Bliss expressed serious concern about Mother's ongoing, unresolved substance abuse issues, and her ability to meet Child's needs and welfare. *Id.* . . ." O.C.O. (Mother) at 25 (cleaned up).

Indeed, upon review, Dr. Bliss testified, "the biggest concern for Mom is the possibility of drug and alcohol use and the fact that she isn't currently

receiving any treatment or attending urine analyses. My recommendations were in that same vein, that she needs to get an updated drug and alcohol evaluation and attend treatment at the level that they recommend, that she needs to attend her urine analyses and show continued sobriety." Notes of testimony, 11/6/23 at 18-19.

Further, Dr. Bliss found Mother "deceitful" during her individual evaluation in discussing the history of her substance abuse problem, her treatment, and the cause of Child's dependency. *Id.* at 26-29. She testified on cross-examination by CYF's counsel, as follows:

> Q. [W]hy is the deceitfulness on Mom's part a concern for you?
>
> A. For a variety of reasons. [F]irst of all, anytime somebody is deceitful about any bits of information, it naturally causes you to question any of the information given and so then we are uncertain where they are at with anything in that regard.
>
> Secondly, more for her, I have concern about her seemingly not knowing that or not believing that she has a substance abuse concern and being deceitful perhaps to herself and . . . to other people about where she's at with that and how that might impact her parenting. . . . My concern with her is that this deceitfulness might lead her to not admit if she suddenly had a problem again or relapsed and that her daughter would be in danger.

*Id.* at 29-30.

Additionally, the orphans' court considered Dr. Bliss's conclusion regarding the bond between Child and her second set of kinship foster parents, with whom she has resided since August 2, 2022, and who are a pre-adoptive

resource. Notes of testimony, 10/20/23 at 84. The court aptly set forth Dr.

Bliss's conclusions, as follows.

> "The bond is appropriate and [Child] appears to be securely attached to them. She also used them as a secure base during the interactional. The foster parents offered praise and encouragement, and Child was receptive to that and appeared to be happy and feel safe and secure with them." [Exhibit 19]. Dr. Bliss found that if termination was to occur that Child has a strong and positive bond with her [kinship] caregivers. [Exhibit 20].

O.C.O. (Mother) at 26. Further, Dr. Bliss testified during cross-examination

by Child's counsel that Child has a strong bond with her foster parents and

views them as her "psychological parents." Notes of testimony, 11/6/23 at

21-22. Moreover, she confirmed that Child's relationship with her foster

parents could "ameliorate any level of discomfort that she might feel" if

Parents' parental rights are terminated. *Id.* at 41.

Based on the foregoing evidence, the court concluded:

> Child spent the first fifteen months of her life with Mother, and the next twenty-two months in [kinship] foster care. At the time of the termination, the expert testimony determined that the [kinship] foster parents were her psychological parents, and in addition to meeting her physical needs, they were meeting the intangible needs and expressed a desire for her to achieve permanency through adoption in [their] home. . . . [I]t was the opinion of this [c]ourt that termination would not sever a necessary and beneficial bond and there was no evidence that this young child would otherwise suffer severe consequences because of the termination.

O.C.O. (Mother) at 26 (citing *T.S.M.*, 71 A.3d at 267 (when weighing the factors relevant in a termination proceeding "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.")). Finally, the court reasoned:

> Where this court found that CYF had proven, by clear and convincing evidence, that grounds existed [to terminate Mother's parental rights under Section 2511(a)(2)], this court did not abuse its discretion or commit an error of law in determining that termination was in Child's best interest and that the secure attachment she had with her kinship foster parents, who expressed to Dr. Bliss that they were pre-adoptive, would mitigate any negative consequences.

O.C.O. (Mother) at 27 (cleaned up). Because we discern no abuse of discretion, we affirm the termination order with respect to Mother.

Turning to Father's sole issue on appeal, he argues that the court abused its discretion in terminating his parental rights pursuant to Section 2511(b) because the evidence demonstrated that it would cause Child to suffer "a psychological detriment." Father's Brief at 10. Father relies on Dr. Bliss's opinion that Child "appears to have a strong bond attachment to him, so I do not believe it would be in her best interest to sever any contact." *Id.* at 14 (citing notes of testimony, 11/6/23 at 13). For the following reasons, Father is not entitled to relief.

There is no dispute in this case that Child shares a bond with Father and views him as one of her "psychological parents," which Dr. Bliss described is

"somebody [whom] the child looks to meet [his or her] needs when [he or she is] with them." Notes of testimony, 11/6/23 at 9. The orphans' court explained in its Rule 1925(a) opinion that it fully considered and accepted Dr. Bliss's testimony in this regard. O.C.O. (Father) at 12-13. Further, the court considered Dr. Bliss's opinion that it would not be in Child's best interest to sever contact with Father. However, the court recognized that Dr. Bliss "acknowledged there were several things that Father would need to do to make progress towards unsupervised visitation and reunification, which she estimated would take three to six months of sustained progress and effort."[8] *Id.* at 13 (citing notes of testimony, 11/6/23 at 25-26). As such, in determining whether CYF satisfied its burden under Section 2511(b), the court explained that it "could not ignore Father's posture and progress after [Child] had remained in placement for twenty-two consecutive months." *Id.* at 10.

Specifically, the court considered that Father participated in three drug and alcohol assessments during Child's dependency, but Father conceded on direct examination that he never engaged in any recommended treatment or

---

[8] Dr. Bliss testified Father "needs to prove current sobriety to get unsupervised visits and then that they would increase in rate and time. And I always recommend working toward having an overnight visit and ensuring that all is going well before ultimately reunifying." Notes of testimony, 11/6/23 at 13. Dr. Bliss clarified that Father would need to prove sobriety "for a period of three months" for unsupervised visits to occur. *Id.* In addition, Dr. Bliss testified that Father would need to follow all recommendations for drug and alcohol treatment "if reunification is going to occur." *Id.* at 25; *see also id.* at 31-32.

urine screens which had been court-ordered since February of 2022. *Id.* at 14 (citing notes of testimony, 11/6/23 at 47-49, 51). In addition, the court weighted the testimony of CYF caseworker Pavilonis that Father "was dishonest with CYF about being involved in [drug] treatment when he was not." *Id.* at 10 (citing notes of testimony, 10/20/23 at 77). In his direct examination, Father testified:

> Q. You've heard Dr. Bliss's testimony that if you could show clean screens and sobriety for a period of three months, that you could move to unsupervised visits. Do you believe you can do that?
>
> A. Yes.
>
> Q. Why do you think that that's different since . . . when the case was opened?
>
> A. Since [Child has] been taken, it's just rough, and I'm finally just seeing, like, the severity, the realization. I'm just waking up.

Notes of testimony, 11/6/23 at 62.

However, the court made the following credibility determinations against Father:

> While claiming he just "woke up" to the realization that he needed to follow through on goals for the sake of Child, [Father] failed to attend a urine screen when called by CYF in between the first and second day of termination proceedings. [Notes of testimony, 11/6/23 at 65-66]. [In addition,] Father provided no explanation as to why he would have testified to the court in December 2022 [during a permanency review hearing] that he had completed a drug and alcohol assessment in August 2022, started treatment twice a week, and step down to once a week, when it was not true. *Id.* at 66-69. Additionally, Father could not

- 21 -

> provide any reasonable explanation as to why he denied having intimate partner violence with the mother of his older child, [Child's half sibling,] despite having related charges within his criminal record….
> ***Id.*** at 68-70.

O.C.O. (Father) at 15. Thus, the court gave no credence to Father's vow to begin complying with drug treatment.

Moreover, the orphans' court carefully considered the High Court's decision in ***K.T.***, ***supra***, and stated that it "does not discount the love and potential comfort that [Child] receives while visiting with Father. Nevertheless, the record fully supports that Child will receive the necessary love, comfort, security, and stability in the pre-adoptive [kinship] home. . . ." O.C.O. (Father) at 16. The court found, as follows.

> [Child's kinship] placement has demonstrated consistently over the course of a year that they are able to meet both her tangible and intangible needs. [Dr. Bliss] noted that Child has a secure attachment with her foster parents and views them as psychological parents. This [c]ourt also considered whether a necessary and beneficial bond existed between Child and Father, such that if the bond was broken, Child would suffer extreme emotional consequences. Again, a review of the totality of the record demonstrates that while the visits between Child and Father may have been mutually beneficial, there was no evidence or testimony that Child would experience extreme emotional consequences if this bond was severed. To wit, the testimony of [Dr. Bliss] was that the strong bond and attachment Child had established with her [kinship] parents could mitigate any adverse impact [of] termination….

***Id.*** at 16-17; ***see also*** notes of testimony, 10/20/23 at 84-85, 103; notes of testimony, 11/6/23 at 13-14, 21-22, 41.

The testimonial evidence amply supports the court's findings, and we discern no abuse of discretion by the court placing primary importance on Child's need for permanency and stability in this case where Child "was fifteen months old at the time of removal and spent the next twenty-two months in [kinship] foster care. At the time of the termination proceedings, Child was three years and two months old and had spent more time in care with relatives than she did in the care of either parent." O.C.O. (Father) at 17. Accordingly, we affirm the order involuntarily terminating Father's and Mother's parental rights.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/21/2024